**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 22 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

 Plaintiff - Appellee,

v.

JASON THOMAS ENCINIAS,

 Defendant - Appellant.

No. 03-8032

(D. Wyoming)

(D.C. No. 02-CR-99-D)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

 Jason Thomas Encinias, a/k/a "JT," was convicted, following a three-week jury trial, of six counts of methamphetamine trafficking and firearms offenses. He was sentenced to 360 months in prison and a $5600 fine, followed by five years of supervised release. Encinias challenges his conviction[1] on appeal,

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1]On September 2, 2004, Encinias filed a "Motion to Withhold Disposition of Panel Decision Pending Supreme Court Resolution of United States v. Booker [125 S. Ct. 738 (2005)] and United States v. Fanfan, or in the Alternative, to Set a

(continued...)

arguing (1) the case should be dismissed because the federal filing was allegedly an unconstitutional act of prosecutorial vindictiveness in response to Encinias's insistence on his speedy trial rights in state court; (2) the district court erred by failing to suppress evidence obtained through an allegedly defective search warrant; (3) the district court erred by admitting coconspirator hearsay statements, without making findings required under Fed. R. Evid. 801(d)(2)(E); (4) there was insufficient evidence to support the conspiracy conviction charged in the Indictment; (5) that assuming proof of a conspiracy lesser in scope, there was a fatal variance between the Indictment and the proof at trial, which, at most, established multiple conspiracies; and (6) his right to a fair trial was violated by a courtroom outburst and inadvertent references to a murder. For the reasons set forth below, we affirm.

## BACKGROUND

On September 16, 2002, Encinias, Xavier Arriola-Perez, a/k/a "X," and Steven Waite[2] were charged in an eleven-count superseding federal Indictment.

_____

[1](...continued)
Briefing Schedule on the Question of Whether Appellant's Sentence Violated the Sixth Amendment." On February 9, 2005, Encinias filed an unopposed motion to withdraw his previous Blakely motion. We grant his February 9 motion, and we do not consider Encinias's sentence in this appeal. In addition, Appellant's motion of January 22, 2004, to supplement the record on appeal is granted.

[2]Arriola and Waite each challenge their conviction and sentence in separate appeals before this court, United States v. Xavier Arriola-Perez, No. 03-8048
(continued...)

The Indictment charged that, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, they had conspired together and with a number of individuals, including Samuel Urbigkit, Joseph Thomas, Crystal Siegel, Joseph Dax, Vanessa McQueary, and Brett Strong, to distribute more than 500 grams of methamphetamine in the District of Wyoming between March 2000 and December 2001. Waite was granted a severance, and Encinias and Arriola were tried together in a jury trial that began January 7, 2003. Most of the other individuals named as conspirators in the Indictment, including Siegel, Dax, McQueary, and Strong, were charged in separate proceedings, reached plea agreements with the prosecution, and testified against Encinias and Arriola at trial.

In addition to conspiracy (Count 1), Encinias was charged in the Indictment with seven other counts: (Count 5) possession of an AK-47-type rifle during and in relation to a drug-trafficking offense, in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2; (Count 6) possession with intent to distribute 500 or more grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 18 U.S.C. § 2; (Count 7) distribution of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2; (Count 8) unlawful possession of a .45 caliber Hi-Point firearm during and in relation to a drug-trafficking offense, in

[2](...continued)
(10th Cir. filed June 10, 2003), and United States v. Steven James Waite, No. 03-8100 (10th Cir. filed Dec. 3, 2003).

violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2; (Count 9) being a felon in possession of the Hi-Point firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1); (Count 10) possession with intent to distribute approximately one pound of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2; and (Count 11) being a felon in possession of a .25 caliber semi-automatic pistol, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).  Encinias was convicted of all charges except Counts 5 and 11.  On April 17, 2003, the district court sentenced Encinias to 300 months on Counts 1, 6, and 10; 240 concurrent months on Count 7; and 60 consecutive months on Counts 8 and 9, for a total of 360 months in prison.

Testimony at trial, some of which is challenged on appeal as inadmissible hearsay, established the following facts.  In early 2000, Encinias, Arriola, Waite, Urbigkit, Strong, Thomas, and Dax were incarcerated together in the Wyoming State Penitentiary on charges unrelated to this case.  Each of them was thereafter transferred at various times to a halfway house in either Casper or Cheyenne.  While at the Cheyenne halfway house, Dax, Urbigkit, and Waite discussed plans to distribute methamphetamine when they were released.  Encinias was not a party to these discussions, and the prosecution did not present evidence of specific conversations about drug trafficking between Encinias and the other prisoners.  It

was established, however, that Encinias was at least acquainted with most of these individuals while he was in prison.

Arriola moved to Denver upon release from the halfway house in August 2000 and began supplying distribution quantities of methamphetamine to Urbigkit when Urbigkit was released two months later. Brett Strong testified that he was Urbigkit's roommate at the halfway house and that after he was released, he sold about an ounce of methamphetamine a week for Urbigkit beginning in September 2000. On at least two different occasions, Strong saw Arriola at Urbigkit's house, and Strong recounted seeing Arriola pull out a pound to a pound and a half of methamphetamine, which was "more than [Strong had] ever seen before." Tr. of Jury Trial, R. Vol. 31 at 435. Urbigkit and Arriola used a scale to weigh and divide the drugs. Strong witnessed Urbigkit at that time give Arriola a "pretty good sized" stack of hundred-dollar bills. Id. at 436.

Crystal Siegel testified that she cleaned Urbigkit's apartment and was paid in money and drugs. She moved in with Joe Thomas, Urbigkit's friend, after Urbigkit told her he would pay her $500 a day to do so. She witnessed Thomas sell drugs, and saw Thomas receive methamphetamine from Urbigkit. Siegel said she worked as a "secretary" for the drug-distribution operation by keeping track of debts and by selling drugs from the apartment when Thomas was away. She also at one time transported a duffel bag containing three pounds of

methamphetamine and a firearm from the apartment to Urbigkit's shop. Siegel testified that Urbigkit said "X" was his "main [drug] connection." Id., R. Vol. 33 at 836. Also, while cleaning Urbigkit's apartment, Siegel said she saw pieces of paper on which "X" and a phone number were written. She and Thomas on one occasion met Arriola at a motel room where they all got high together. Adam Schaff, another drug user and dealer, testified that over the course of several months, he sold a total of ten and a half pounds of methamphetamine for Thomas and Urbigkit.

In February 2001, while Encinias was still in the state penitentiary, Urbigkit was arrested in Casper after a dramatic shootout with police who were attempting to search Urbigkit's shop. Detailed and voluminous testimony from a number of law enforcement officers about the shootout, search, and arrest of Urbigkit was admitted at the trial over objections from both defendants.[3] Police ultimately seized from the shop several firearms, including an AK-47-type gun, and around four pounds of methamphetamine, which was admitted as evidence at Encinias's trial. Joseph Dax, another drug user and dealer, testified that Arriola told him that he "lost a lot of money when Sam [Urbigkit] got caught" because the drugs seized from the shop were his. Id., R. Vol. 34 at 981.

---

[3]Because most of the testimony about Urbigkit's arrest is generally irrelevant to the issues Encinias raises on appeal, we summarize it here.

Law enforcement also learned that Urbigkit had murdered Dennis Fisher, a man who owed him money, and placed his body in a barrel. The district court ordered that all information about the murder be suppressed at the trial, and redacted from the Indictment's conspiracy allegations "Overt Act 6," which referenced the murder, before giving the Indictment to the jury. However, at trial, Dax made a passing reference to Urbigkit as a "murderer" and noted being interviewed by a "homicide" detective, and Siegel stated that a "murder" had occurred in her apartment. In state proceedings separate from those relating to Encinias and Arriola, Urbigkit was sentenced to five consecutive life sentences.

Dax testified that he shared a cell with Urbigkit and knew Encinias and Arriola while they were all in prison together. Shortly after Urbigkit was arrested, Dax received a message at work from Arriola, who posed as his brother-in-law. The two met for lunch a few days later, at which time Arriola told him he "needed another source to get rid of some . . . dope" and "things were pretty hot in Casper." Id. at 959-60. Dax was still at the halfway house when he had lunch with Arriola, and, because he was still subject to searches and drug testing, he delayed becoming involved. However, only a few days after Dax's release from the halfway house in March 2001, he, Waite, Arriola, and several of Arriola's friends from California met at Waite's house. Arriola and his friends brought a pound of methamphetamine with them, which Waite and Dax split.

-7-

Dax testified that as time went on a pattern developed where he and Waite would split and sell a pound of methamphetamine delivered by Arriola each week. Dax would sometimes visit Arriola in Denver to pay him the proceeds from the sales, or Arriola would come to Wyoming to collect and deliver more drugs. This activity went on for five months, and Dax testified that he and Waite ultimately dealt between twenty and twenty-five pounds of methamphetamine for Arriola. Dax testified that his and Waite's activities with Arriola ceased in August 2001 after Arriola showed up early to collect and threatened him with a gun.

Micole Smith, Dax's live-in girlfriend, testified that Dax said he got his methamphetamine from Arriola and that Arriola had been to her and Dax's apartment several times. She also stated that she traveled with Dax to Denver throughout the summer of 2001, and on one trip they delivered $3000 in "[h]undreds, fifties, [and] twenties" to Arriola. Id., R. Vol. 36 at 1122. She also recalled the August 2001 visit in which Arriola showed up to collect money and appeared "[v]ery agitated." Id. at 1132.

Encinias was the last of the group to be transferred to and then released from the halfway house. He was released in June 2001. Encinias and Vanessa McQueary met on July 12, 2001, in Casper. McQueary testified that on that day, Encinias gave her drugs for personal use. She also witnessed Encinias sell three grams of "glass" (a stronger form of methamphetamine) to Erny DeWitt, a mutual

-8-

friend, and later saw Encinias count out $3000 in cash. That night, she and Encinias were stopped by police when they were on their way to a party. Encinias asked McQueary to hold some marijuana and methamphetamine for him. She tossed the weed and a needle out the window but hid two grams of methamphetamine down her pants. Later that night, she and Encinias sold to DeWitt some of the methamphetamine that had been hidden from police.

A few days later, McQueary traveled with Encinias and several others to Denver for the purpose of buying drugs from Arriola. McQueary testified that after they arrived at the Ramada Inn in Denver, Encinias made several phone calls and said he was calling Arriola. Records offered into evidence corroborate that calls were made at this time between phones connected to Encinias and Arriola. Arriola, Encinias, and McQueary then met in the parking lot of the motel. Encinias left the motel for an extended period of time and later told McQueary that he had traveled to Cheyenne with Arriola to pick up some drug money. The stay at the Ramada Inn during the period in question was corroborated by motel receipts, entered into evidence, and a picture identification card Encinias allowed hotel personnel to copy.

McQueary stated that she and Encinias arrived back in Casper with twenty-four ounces of methamphetamine. McQueary testified that they checked into the Parkway Plaza and that she borrowed a scale from a friend so that they could

-9-

weigh out various quantities. Half of the twenty-four ounces was delivered by Encinias and McQueary to Zeb Carrick, another dealer who had previously given Encinias money for the drugs and whose sister was romantically involved with Arriola. Phone records show Encinias had called Arriola after returning to Casper, and McQueary testified that this call was to get Carrick's address in preparation for the delivery.

Later, McQueary and Encinias got into an argument, and McQueary left the Parkway Plaza and stayed with friends. It was not long, however, before she persuaded her friend Aubrey Williams, a cab driver, to take her to Encinias, who had since shifted his operation to the Motel 6. Encinias sold Williams a sixteenth of an ounce when he dropped off McQueary, then another sixteenth of an ounce the next morning when he visited the motel room again. Williams testified that he saw Encinias cleaning a gun in the motel room. McQueary and Encinias then borrowed a friend's vehicle to drive around and sell some more of the drugs. The two later paid cash for a used truck. Encinias's stay at the Casper Motel 6 was corroborated by hotel registration paperwork, entered into evidence, showing that he checked in on July 18, 2001.

Meanwhile, on July 17, 2001, the Division of Criminal Investigation ("DCI") in Casper received two anonymous phone calls. The callers stated that a man known as "JT" would be traveling from Colorado to Casper with a kilo of

methamphetamine. The callers also gave a physical description of "JT" and stated that he had recently been released from the Wyoming State Penitentiary. This information was passed on to Casper Police Department Officer Stacia Moeller, who began investigating the tipsters' information. Officer Moeller inquired at the penitentiary and discovered that "JT" was Jason Thomas Encinias. She also obtained Encinias's booking photo from the county sheriff's office.

Two days after the calls, Moeller and another officer were out looking for Encinias at his former residence. As the officers were finishing up for the day, they passed Encinias, who was riding in the passenger seat of a truck. They followed the truck to the Motel 6 and watched Encinias enter a motel room with a woman later identified as McQueary. The officers waited until they saw Encinias and McQueary leave again in the truck. Encinias was driving this time, and the officers, who had previously learned that he had a suspended license, arrested him. McQueary was released.

Officer Moeller testified that as she was heading back to the station after arresting Encinias, she heard over the police radio that someone had broken into the Motel 6 room where Encinias and McQueary had been staying. McQueary testified that as Encinias was being arrested, he "mouthed" her instructions to go back to the motel and retrieve a black duffel bag containing the .45 caliber Hi-Point gun and the unsold portion of the methamphetamine they had bought

-11-

from Arriola. McQueary hitched a ride back to the motel, broke the room's window, and took the bag.

While processing the scene of the Motel 6 break-in, officers discovered a marijuana cigarette in the ashtray. The investigating officer contacted Moeller, told her of the discovery, and also told her that witnesses had seen a woman matching McQueary's description leave the scene with a black duffel bag. The police department thereafter executed a search warrant for the room and discovered a triple-beam scale and a large Ziplock bag, both of which later tested positive for methamphetamine residue, and paperwork bearing Encinias's name, the back of which had been used for mathematical figuring of drug quantities. All of these items were offered as evidence at trial. Officers, however, neglected to take the marijuana cigarette into evidence.

In the meantime, McQueary visited the homes of family members and friends to hide out and to sell as much of the methamphetamine as she could. She testified, and phone records corroborate, that she called Arriola several times from a cell phone to seek his advice on bailing Encinias out of jail. Arriola told her not to call him on a cell phone and said that he could not help because all of his money was tied up in unsold drugs in Wyoming.

McQueary ended up at the apartment of Aubrey Williams. The police visited the apartment but Williams would not let them in. Williams and

-12-

McQueary both testified that while the officers were obtaining a search warrant, McQueary flushed some of the methamphetamine down the toilet and shot up as much of it as she could. Police eventually arrested McQueary at the apartment, where they found $2032 in cash, packaging materials, used syringes, a spoon with methamphetamine residue, the remaining drugs, which amounted to only three-tenths of a gram by that time, and the Hi-Point .45 caliber gun concealed in a box of laundry soap in the duffel bag. The gun and drugs were admitted as exhibits at trial.

On August 3, 2001, during a short hiatus from jail, Encinias visited the apartment of Amanda Hale, who was dating one of Encinias's friends. Hale testified that Encinias asked her to hold a pound rock of methamphetamine for him and also told her that his drug source was in Denver. Encinias came back a few days later in a drug-induced paranoia, told Hale that the cops were after him, and dropped a small digital scale and the pound of methamphetamine down a hole in her closet wall. Hale testified that she later allowed officers to retrieve the scale, and the state crime lab found Encinias's fingerprints on the scale's box. Officers did not find the pound of methamphetamine in the wall, and Hale testified that Encinias had previously retrieved it with a coat hanger.

State drug charges were filed against Encinias on July 20, 2001; an amended state information was filed July 30, 2001. Trial in state court was set

for November 13, 2001, but on November 8, 2001, Natrona County Assistant District Attorney Michael Blonigen, who was also designated as a Special Assistant United States Attorney ("SAUSA"), and Nadine McLeod, Encinias's court-appointed attorney, presented the judge with a stipulated motion for a continuance. The state judge granted the continuance on the condition that Encinias sign a waiver of his speedy trial rights. Encinias refused to do so. On November 9, 2001, federal charges were filed with the assistance of Blonigen, acting in his dual capacity as a SAUSA, and the state case was dismissed. The superseding federal Indictment was filed on September 16, 2002.

A little more than a week before federal charges were filed, Encinias received a jailhouse visit from Alcohol, Tobacco and Firearms ("ATF") Agent Daniel Raponi and state DCI Agent Mark Sellers. Raponi testified that he made the visit intending only to acquire Encinias's fingerprints for investigation of other charges. After Encinias had been fingerprinted, Raponi testified that Encinias volunteered to speak to him about possible federal gun charges, stating, "I don't have anything to hide." Tr. of Hr'g on Pending Mots., R. Vol. 13 at 52. Encinias was read his Miranda rights but nonetheless told Raponi and Sellers that he was a methamphetamine dealer and had purchased a .45 caliber firearm to protect himself while dealing. Encinias also told the agents he had possessed several firearms and gave the agents information indicating that Arriola was his

-14-

source of methamphetamine. Encinias sought to suppress his statements before trial, but the judge denied his motion, and both Raponi and Sellers told the jury about their conversation with Encinias, including his admissions. He does not challenge the denial of his suppression motion on appeal.

Encinias's counsel also moved to suppress the Motel 6 evidence before trial because of several defects in the warrant affidavit prepared by Officer Moeller. Moeller admitted that she mistakenly substituted "cocaine" for "methamphetamine" in the affidavit and that she forgot to seize the marijuana cigarette during the search. The court found that despite the warrant's "deficiencies," which were not "insubstantial," id., R. Vol. 13 at 104, the officers who executed it acted in good faith.

Encinias also asked the judge to hold a pretrial hearing to determine the admissibility of coconspirator testimony when it became apparent that the government intended to call witnesses who had agreed to plea bargains. The court declined to do so, but nonetheless allowed testimony from Strong, Dax, McQueary, Hale, Siegel, and Schaff.

A jury found Encinias guilty of six of the eight counts, described above, with which he was charged in the superseding Indictment. He was acquitted of two of the firearms counts: Count 5, alleging possession of an AK-47-type weapon, and Count 11, alleging possession of a .25 caliber pistol.

We address each of Encinias's contentions, set forth above, in turn.

## DISCUSSION

### I. Prosecutorial Vindictiveness

Encinias first asserts that his due process rights were violated because Prosecutor Blonigen allegedly filed the federal charges in this case in response to Encinias's refusal to waive his speedy trial rights in state court proceedings relating to the same drug trafficking. Encinias did not raise this contention below. We therefore review for plain error, which occurs only when there is "'(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Burbage, 365 F.3d 1174, 1180 (10th Cir.), cert. denied, 125 S. Ct. 510 (2004) (quoting United States v. Price, 265 F.3d 1097, 1107 (10th Cir. 2001)); United States v. Ray, 370 F.3d 1039, 1044 (10th Cir. 2004), petition for cert. filed (Sept. 7, 2004) (No. 04-6234).

A defendant may not be penalized for exercising constitutional or statutory rights during the course of a criminal proceeding. United States v. Raymer, 941 F.2d 1031,1040 (10th Cir. 1991).

> To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to

-16-

penalize a person's reliance on his legal rights is "patently unconstitutional."

Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) (quoting Chaffin v. Stynchcombe, 412 U.S. 17, 32-33 (1973) (citation omitted)).  A defendant may demonstrate a due process violation by showing either (1) actual vindictiveness or (2) a realistic likelihood of vindictiveness which gives rise to a presumption of vindictiveness.  Raymer, 941 F.2d at 1040.

Encinias argues that the facts of his case establish actual vindictiveness, or, at the very least, a presumption of vindictiveness.  As noted above, Encinias pleaded not guilty in state court to charges of conspiracy to deliver methamphetamine and possession of methamphetamine with intent to deliver.  Michael Blonigen, who was prosecuting Encinias's case in state court but who also sometimes served as a federal prosecutor, planned to go on vacation during the week of Encinias's state trial and therefore asked McLeod, Encinias's attorney, to stipulate to a continuance.  She stipulated, and the judge granted the continuance on the condition that Encinias sign a waiver of his speedy trial rights.  Encinias refused to do so.  McLeod then learned that Blonigen was considering federal charges and, in an attempt to avoid the harsher penalties of the federal system, obtained a change-of-plea hearing for Encinias.  But before Encinias could plead guilty in state court, the federal charges were filed.  Blonigen had refused to engage in any plea negotiations with Encinias at the state court level.

McLeod understood this as an indication that Blonigen had "preferred to go federally" all along. Tr. of Hr'g on Pending Mots., R. Vol. 13 at 70. No threats of federal prosecution were made against Encinias at any time.

We are unconvinced that these facts plainly constitute either actual vindictiveness or a presumption of vindictiveness. First, no actual vindictiveness existed because there is no evidence, other than an inference flowing from the timing of the events described, indicating that the federal charges were in fact filed in direct response to Encinias's refusal to waive his speedy trial rights. See United States v. Goodwin, 457 U.S. 368, 380-81 (1982) (finding no evidence of actual vindictiveness where "prosecutor never suggested charge was brought to influence [defendant's] conduct").

We are equally unpersuaded that a presumption of vindictiveness is warranted here. While it is sometimes necessary to presume vindictiveness because a prosecutor's "[m]otives are complex and difficult to prove," such a presumption should be indulged only "in cases in which a reasonable likelihood of vindictiveness exists." Id. at 373.

Blonigen's decision to charge Encinias federally could have been motivated by any number of factors. The most plausible explanation is that he had always planned to file federal charges, as McLeod testified, and with a planned vacation and a state trial quickly approaching, time was running short. Blonigen's refusal

-18-

to engage in plea negotiations supports this account. The only support Encinias gives for his argument is the bare fact that he was charged federally the day after he refused to sign a speedy trial waiver. We decline to pile inferences, and we find that this fact, without more, fails to give rise to a reasonable likelihood of vindictiveness.

## II.     Search Warrant

Encinias next asserts that the district court erred by not suppressing the evidence seized from the Motel 6 room, including the triple-beam scale, the Ziplock bag with methamphetamine residue, and the paperwork bearing Encinias's name. Encinias argues that the affidavit supporting the Motel 6 warrant (1) was not supported by probable cause and (2) cannot be saved by the exclusionary rule's good faith exception announced in United States v. Leon, 468 U.S. 897 (1984).

Before issuing a search warrant, a magistrate judge must "'simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Tuter, 240 F.3d 1292, 1295 (10th Cir. 2001) (quoting Illinois v. Gates, 462 U.S.

213, 238 (1983)).  Even if a warrant is not supported by probable cause, the search may still be valid if the <u>Leon</u> good faith exception to the exclusionary rule applies.  <u>United States v. Rice</u>, 358 F.3d 1268, 1274 (10th Cir. 2004), <u>petition for cert. filed</u> (July 23, 2004) (No. 04-5520).

Officer Moeller's affidavit states, in relevant part:

On July 17, 2001, I was informed by [Special Agent] Al Bennett, that he had received a telephone call from an anonymous female who advised that a suspect that she knew as "J.T.", later identified as Jason Encinias, was traveling back from Colorado to Casper, Wyoming, with a kilo of cocaine.

On July 17, 2001, I was informed by [Special Agent] Brad Wnuk, that he had received a telephone call from an anonymous male who advised that a subject that he knew as "J.T.", later identified as Jason Encinias, was traveling back from Colorado to Casper, Wyoming, with a kilo of cocaine.

On July 19, 2001, at 6:30 p.m., Jason Encinias . . . was arrested at 59 Curtis, Evansville, Natrona, Wyoming, for driving under suspension and no insurance.

On July 19, 2001, at 7:22 p.m., Officer Pat Carr, Casper Police Department, received a call at 1150 Wilkens Circle, Room #148, for a female that had just broken the window out of the room and removed a black duffle bag and then left the area.  Officer Carr found no one present when he arrived at the room.  Officer Carr spoke to the manager of Motel 6, and she advised the room was registered to Jason Encinias.

Officer Carr processed the crime scene and during the processing he located what he believed, from his training and experience, to be a marijuana cigarette.

-20-

Appellant's Br. at Attach. 1. The remainder of the affidavit contains boilerplate language generally describing drug-trafficking evidence commonly seized from motel rooms.

Encinias argues that the affidavit contains the following deficiencies: it stated that "JT" would be arriving in town with a kilo of cocaine instead of methamphetamine; it did not indicate that Officer Moeller took steps to corroborate the information supplied by the anonymous tipsters, especially the allegations of illegal activity; it did not include information on how Moeller determined that he was "JT"; and it failed to state how the presence of the marijuana cigarette, which was never seized, gave rise to a probability of methamphetamine dealing.

The district court noted these shortcomings yet denied Encinias's motion to suppress. The court concluded that the warrant was "unquestionably" saved by Leon without expressly stating whether it was supported by probable cause. "When reviewing a district court's denial of a motion to suppress . . ., we accept the court's findings of fact unless clearly erroneous and consider the evidence in the light most favorable to the government." Rice, 358 F.3d at 1273 (internal quotation marks omitted). We review de novo the district court's finding of Leon good faith. United States v. Vanness, 342 F.3d 1093, 1097 (10th Cir. 2003).

We turn first to the question of whether the <u>Leon</u> good-faith exception applies to the Motel 6 search. "If this court determines that the officers acted in good faith . . ., it does not need to reach the issue of whether probable cause existed for the warrant." <u>Price</u>, 265 F.3d at 1102. The Court in <u>Leon</u> stated that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." <u>Leon</u>, 468 U.S. at 918. It is presumed that when an officer relies on a warrant, the officer is acting in good faith, <u>United States v. McKneely</u>, 6 F.3d 1447, 1454 (10th Cir. 1993), and the inquiry is confined to "the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." <u>Id.</u> (internal quotations omitted). An officer does not exhibit good-faith reliance, however, when the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" <u>Leon</u>, 468 U.S. at 923 (quoting <u>Brown v. Illinois</u>, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part)). Encinias argues that this situation existed in his case.

We disagree and find that the affidavit, though far from a "model of clarity," <u>Price</u>, 265 F.3d at 1102, is not so fatally flawed as to justify exclusion of the Motel 6 evidence. A more complete affidavit would have included the steps

Moeller took to corroborate both the identity of "JT" and the tipsters' allegations. We cannot say, however, that the warrant would necessarily fail because of this deficiency. See United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000) (despite detective's failure to outline corroborating information in his affidavit, good faith found because detective's investigation into the informant's allegation sufficiently linked the defendant's home to the illegal activity); United States v. Bishop, 890 F.2d 212, 217 (10th Cir. 1989) (officers acted in good faith despite relying on an affidavit that did not contain information crediting informant's veracity). Even though lacking corroborating information, the affidavit contained more than merely the assertions of the anonymous tipsters whose veracity and knowledge had not been tested. The affidavit included the information Moeller had learned from another officer who was investigating the Motel 6 burglary:

> [A] female . . . had just broken the window out of the room [Encinias and McQueary had been staying in] and removed a black duffle bag and then left the area. [The officer] then spoke to the manager of Motel 6, and she advised the room was registered to Jason Encinias. Officer Carr . . . located what he believed, from his training and experience, to be a marijuana cigarette.

Appellant's Br. at Attach. 1.

Nor does Moeller's substitution of "cocaine" for "methamphetamine" in the affidavit warrant suppression of the evidence. Moeller testified that this was simply a mistake, and we have no contrary evidence of a deliberate attempt to mislead the magistrate. See United States v. Tisdale, 248 F.3d 964, 973-74 (10th

-23-

Cir. 2001) (no evidence that affiant knowingly or recklessly included false statements in warrant affidavit, so good-faith exception applied). We therefore defer to the district court's finding that "[t]here's no shenanigans. There's no effort to hoodwink a circuit judge into the issuance of a search warrant." Tr. of Hr'g on Pending Mots., R. Vol. 13 at 105. The district court properly admitted the Motel 6 evidence.[4]

## III.   Coconspirator Hearsay Statements

Encinias next challenges the district court's admission of coconspirator hearsay under Fed. R. Evid. 801(d)(2)(E). We review a district court's evidentiary rulings for abuse of discretion. United States v. Davis, 40 F.3d 1069, 1073 (10th Cir. 1994). We give heightened deference to the trial judge's decisions when reviewing hearsay determinations. United States v. Jones, 44 F.3d 860, 873 (10th Cir. 1995).

Rule 801(d)(2)(E) provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a

---

[4]Encinias also argues that if we do not uphold the validity of the Motel 6 search warrant, the evidence seized from Aubrey Williams' apartment should be suppressed because it constitutes fruit of the original poisonous search. The district court ruled before trial that Encinias did not have standing to contest this second search and admitted the evidence. Because we uphold the Motel 6 search, and because Encinias does not appeal the district court's ruling that he lacked standing to contest the second search, we do not consider this argument.

party during the course and in furtherance of the conspiracy." Before admitting purported coconspirator testimony as non-hearsay, a district court must determine that the statements fall within 801(d)(2)(E)'s definition. Bourjaily v. United States, 483 U.S. 171, 175 (1987). A trial court must find that (1) by a preponderance of the evidence a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy. United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995) (citing United States v. Urena, 27 F.3d 1487, 1490 (10th Cir. 1994)). These factual determinations can be made in two ways. The district court may hold a "James"[5] hearing outside the presence of the jury. Owens, 70 F.3d at 1123. Or, it may provisionally admit the statements on the condition that the prosecution "connect up" the evidence and prove the existence of the predicate conspiracy through trial testimony or other evidence. Id.

Subject to the narrow exception discussed below, a trial court's failure to make Rule 801(d)(2)(E) findings on the record is an abuse of discretion. United States v. Rascon, 8 F.3d 1537, 1539 (10th Cir. 1993). In such a case, we are to first assume that the challenged statements are inadmissible, then assess whether

_____

[5]United States v. James, 590 F.2d 575 (5th Cir. 1979), set forth a pretrial proceeding enabling the district court to determine whether coconspirator statements were admissible at trial under Fed. R. Evid. 801(d)(2)(E).

their admission was harmless error. United States v. Perez, 989 F.2d 1574, 1581

(10th Cir. 1993) (en banc). When a trial court fails to make on-the-record

findings and the admission of the coconspirator hearsay is not harmless, we

remand so the district court can make the 801(d)(2)(E) findings it failed to make

in the first instance. Id.

> [I]f the trial judge determine[s] on remand that the statements were made in the course of and in furtherance of the conspiracy, the convictions . . . stand and the court of appeals . . . retain[s] jurisdiction to review the lower court's determination on the issue. If, on the other hand, the trial court determine[s] that Rule 801(d)(2)(E) was not satisfied, it . . . set[s] the conviction aside and conduct[s] a new trial because the court of appeals ha[s] already concluded that the admission was not harmless.

Id.

Encinias urges us to remand because the district court admitted

the following testimony at trial without 801(d)(2)(E) findings:

- Brett Strong's testimony that Urbigkit told him about plans to distribute methamphetamine after he was released; that Urbigkit said "X" was his source of drugs; and that Urbigkit grabbed the throat of Strong's wife and threatened to murder her.

- Joe Dax's testimony that Urbigkit said he wanted to sell methamphetamine upon release from prison and that "X" was going to be his source.

- Vanessa McQueary's testimony that Encinias asked her to hold his drugs for him; that Encinias stated that he intended to trade a firearm to "X" as partial payment for a drug debt; that Encinias told her that "X" was his "partner"; that Encinias repeatedly told her that he had called "X" from Wyoming and from the Denver motel room; that Encinias told her to open the trunk of their car in Denver so that he

could remove the weapon he was trading to Arriola; that Encinias stated while at the Denver motel that "X" had called and the methamphetamine had arrived; and numerous other statements Encinias made directly to McQueary. Encinias also challenges McQueary's testimony recounting Arriola's statements to her when she called seeking help in bailing Encinias out of jail.

- Adam Schaff's testimony that Urbigkit said the "big guy" was from Colorado and that Thomas had put a gun to his head and threatened to kill him if he cooperated with authorities.

- Amanda Hale's testimony that Encinias told her that he possessed methamphetamine; that he asked her to hold his drugs for him; that he told her that he obtained the drugs from a person in Denver; and that he told her, while high, that the police were after him.

Appellant's Br. at 43-45.[6] Encinias's trial counsel filed a pre-trial motion

for a James hearing, again requested the hearing at Encinias's arraignment, and,

_____

[6]It is apparent that 801(d)(2)(E) is inapplicable to much of the challenged testimony because it was admissible on other grounds. Thus, for example, the testimony of McQueary and Hale recalling what Encinias said and did was admissible under Fed. R. Evid. 801(d)(2)(A), which provides that a statement is not hearsay if it is "offered against a party and is . . . the party's own statement, in either an individual or representative capacity." The trial judge properly ruled that McQueary, by relating Encinias's statements, was "talking about admissions made by a co-defendant." Tr. of Jury Trial, R. Vol. 36 at 1185. See United States v. Gonzalez-Montoya, 161 F.3d 643, 648 (10th Cir. 1998); United States v. McKinney, 822 F.2d 946, 949 (10th Cir. 1987). Similarly, much of McQueary's testimony, as well as Schaff's statement that Joe Thomas put a gun to his head, was not hearsay but rather admissible as direct testimony. United States v. Mobile Materials, Inc., 881 F.2d 866, 871 (10th Cir.1989) ("The direct testimony of a conspirator . . . describing his participation in the conspiracy and the actions of others is not hearsay, and the cases concerning co-conspirator hearsay under Rule 801(d)(2) are inapplicable."); United States v. Smith, 692 F.2d 693, 697 (10th Cir. 1982) ("Rule 801(d)(2)(E) . . . [is] irrelevant to the direct testimony of a coconspirator.").

after no hearing was held, persistently objected to admission of this testimony while the coconspirators were on the stand. After the testimony of Brett Strong, the government's first coconspirator witness, the district court stated:

> I am concerned that we make sure that the Bourjaily test is complied with in every respect before all of this comes in, and I'm not disturbed terribly about what has happened thus far 'cause I think counsel made an effort to lay adequate foundation; but, you know, I don't want to have to have James hearing after James hearing, and I'd like to figure out some way this can be resolved to the satisfaction of everyone.
>
> . . .
>
> I don't intend to have protracted James hearings, and I don't think they're necessary; but I do think it's important that this information be assessed before I allow the testimony to come in every time.

Tr. of Jury Trial, R. Vol. 31 at 454-55, 460. Later, the court explained the procedure it intended to follow in addressing 801(d)(2)(E):

> If, in the course of . . . this trial, if I think on my own, without any motion from anybody, that a James hearing is appropriate, out of an abundance of caution that's what I'm going to do. I will err on the side of caution, but that's how I'll do it. . . . I'll cut the knees out of the government if I determine later that there is no tie-in, and I'll be very, very blunt in my statement to the jury on that point.

Id., R. Vol. 32 at 489-90. The district court then made several formal findings. The court found that the government had shown, by a preponderance of the evidence, that a conspiracy existed, that Strong and Arriola were members of the conspiracy, and that the statements testified to by Strong were made in furtherance of the conspiracy. Later, the court formally found that McQueary's

testimony consisted of statements that were made in furtherance of the conspiracy. However, to have fully complied with the requirements of 801(d)(2)(E), the trial court should have found that Urbigkit, the declarant of many recounted statements, and Encinias were members of the conspiracy and that each challenged statement was made in the course of or in furtherance of the conspiracy.

Encinias seeks a remand for findings due to this oversight. Research reveals that in the eighteen years since the Supreme Court held in Bourjaily that 801(d)(2)(E) was firmly rooted and required no separate inquiry into reliability of coconspirator statements, Bourjaily, 483 U.S. at 182, only a minuscule number of the multitude of reported conspiracy cases have been remanded or reversed due to a trial judge's failure to make formal 801(d)(2)(E) findings. In our circuit, we found only one remand case, Rascon, 8 F.3d at 1541, where we remanded for findings because of the unusual state of the evidence. Notably, there is no report that the remand affected the conviction. Similarly, of the handful of cases remanded in the past eighteen years by other circuits for the failure to make 801(d)(2)(E) findings, we did not find one case in which the outcome of the case was changed as a result. For the following reason, we conclude that remand is unnecessary in any event.

In Perez, we noted that "a case could arise in which the record demonstrates without any question that the trial court did make the requisite inquiry even though no formal findings appear. . . . In [this] event, a remand would not be necessary." Perez, 989 F.2d at 1582 n.3. This is such a case. We agree with the government's argument that because the record shows that the trial judge engaged in repeated 801(d)(2)(E) colloquies with counsel, expressed awareness of the Bourjaily requirements, outlined the procedure it would follow in admitting coconspirator testimony, promised to watch the government closely, and then overruled the motion for a judgment of acquittal and submitted the case to the jury on the entire trial record, we can infer that the judge made the functional equivalent of findings under Rule 801(d)(2)(E).

Alternatively, even assuming, arguendo, that certain of the challenged statements should not have been admitted in the absence of findings, we conclude that the error was harmless because it did not have "a 'substantial influence' on the outcome" or leave us "in 'grave doubt' as to whether it had such an effect." United States v. Cestnik, 36 F.3d 904, 910 (10th Cir. 1994) (quoting United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) (further quotation omitted)). The testimony about Urbigkit's drug-trafficking activities with Arriola was not damaging to Encinias because it did not directly implicate him in the drug conspiracy. Rather, the testimony of McQueary, Hale, and Williams, and of

-30-

agents Raponi and Sellers, was the crux of the government's conspiracy case against Encinias. The trial judge instructed jury members that evidence of Arriola's guilt was not to be used against Encinias and that they were to "give separate and individual consideration to each charge against each defendant." Tr. of Jury Trial, R. Vol. 41 at 2161.

Nor do we doubt that the prosecution presented an abundance of evidence of Encinias's individual guilt. As detailed above, several witnesses, including McQueary and Williams, gave firsthand accounts of Encinias's drug-trafficking activities. Their testimonies are corroborated by the triple-beam scale with residue and the paperwork with mathematical figures recovered from the Motel 6, and the cash, baggies, drugs and Hi-Point firearm seized from Williams' apartment. Phone and motel records further support McQueary's account. Amanda Hale's direct testimony was also corroborated by the scale recovered from inside her wall and the fact that Encinias's fingerprints were found on the scale's box. Finally, and importantly, the jury heard Encinias's confession to agents that he was a drug dealer who carried guns, including the .45 caliber Hi-Point pistol, and that his source of drugs was Arriola. Encinias has failed to persuade us that the admission of the coconspirator testimony warrants a remand.

## IV.  Sufficiency of the Evidence

Encinias next argues that the evidence was insufficient to support his conviction on the conspiracy charge.  Encinias contends that the evidence, at most, showed a conspiracy between him, Arriola, and McQueary, and the government failed to show that he was even remotely connected to the activities of Urbigkit, Thomas, Strong, Siegel, Dax, and Waite, as charged in the Indictment.  He asserts that the conspiracy between Arriola and Urbigkit's group ended in February 2001 when Urbigkit was arrested.  Encinias contends a separate conspiracy, if any, was formed four months later when he was released from prison.  Arguing this multiple-conspiracy theory, Encinias moved for a judgment of acquittal on the conspiracy count, which the district court implicitly denied by sending the case to the jury.

"We review the entire record in the light most favorable to the government to determine whether the evidence, both direct and circumstantial, together with the reasonable inferences to be drawn therefrom, is such that a reasonable jury could find the defendant guilty beyond a reasonable doubt."  United States v. Fox, 902 F.2d 1508, 1513 (10th Cir. 1990).  However, the evidence must do more than "create a suspicion of guilt," and a conviction must not be a result of "piling inference on top of inference."  United States v. Evans, 970 F.2d 663, 671 (10th Cir. 1992) (further citation omitted).

The "essence" of a conspiracy is an agreement to commit a crime. United States v. Recio, 537 U.S. 270, 274 (2003). The government in a conspiracy prosecution must show, by direct or circumstantial evidence, that (1) two or more persons agreed to violate the law, (2) the defendants knew at least the essential objectives of the conspiracy, (3) the defendant knowingly became a part of it, and (4) the alleged coconspirators were interdependent. Evans, 970 F.2d at 668. Encinias argues that interdependence between the conspirators named in the Indictment was not proven at trial.

Interdependence exists where the activities of each coconspirator constitute "essential and integral steps toward the realization of a common, illicit goal." United States v. Edwards, 69 F.3d 419, 431 (10th Cir. 1995) (further citation omitted). A single conspiracy does not exist simply because many individuals deal with a common player; the individuals must be connected in some way. Evans, 970 F.2d at 670. The prosecution does not, however, have to show that each coconspirator knew or had connections with every other coconspirator. Id. "Rather, where large quantities of drugs are being distributed through a key distributor, 'each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know.'" Edwards, 69 F.3d at 431 (quoting United States v. Dickey, 736 F.2d 571, 581 (10th Cir. 1984)).

The "wheel" conspiracy analogy described in <u>Kotteakos v. United States,</u> 328 U.S. 750, 755 (1946), pertains here. Arriola was the hub, Urbigkit's group was one "spoke," and Encinias and McQueary were another "spoke." The evidence was more than sufficient to connect Encinias to Arriola. Whether Encinias was interdependent with Urbigkit is a much closer call. But by viewing the evidence and reasonable inferences in the light most favorable to the government, we find that the jury rationally could have found one conspiracy.

On the facts of this case, it is reasonable to infer that the agreement to engage in a drug-trafficking enterprise, or the formation of the "essence" of the conspiracy, occurred while the coconspirators were in the penitentiary together. Several coconspirators testified directly about drug-trafficking discussions in the penitentiary or halfway house. The seamless and natural way in which this conspiracy operated, with each member smoothly transitioning into the methamphetamine distribution enterprise only days or weeks after release, supports a strong inference that the dealing that occurred on the outside fulfilled the terms of the agreement reached on the inside. We do not know the circumstances of Encinias's commencement of drug trafficking when he was released from the halfway house. But the record does reveal that it was only a matter of weeks before he had a quantity to sell from Arriola, and we have no evidence that Encinias protested or exhibited surprise when approached by

Arriola upon release. Rather, the evidence and reasonable inferences are all to the contrary. This was sufficient for the jury to find beyond a reasonable doubt the existence of an initial agreement by and among this group to traffic in drugs, which was all that was needed to commit the crime of conspiracy.

The government also produced sufficient evidence that the various "spokes" of the "wheel" were enclosed by a "rim," Kotteakos, 328 U.S. at 755, or common goal of the original agreement: to make an illicit profit by distributing large quantities of methamphetamine in the Wyoming market. The ability to make a profit for the venture was dependent upon the success of all members of the conspiracy. It was necessary for Urbigkit, Thomas, and Strong to have begun a viable operation with Arriola, and Dax and Waite to have continued that operation, in order for Encinias to have joined and continued the enterprise when he was released. This profit-driven end is demonstrated by Arriola's rush to line up Dax and Waite after losing money when Urbigkit's shop was raided. See United States v. Heath, 580 F.2d 1011, 1022 (10th Cir. 1978) (in a single conspiracy, the "efforts of each participant affect[] the supplies and profits of the entire enterprise").

The activities of Dax also show that the Urbigkit "spoke" and the Encinias "spoke" belonged to the same "wheel," even though the former ceased operating before the latter began. Dax was Urbigkit's cellmate in prison and testified that

-35-

he spoke to Urbigkit and other conspirators about dealing drugs when they got out. And although Dax testified that he had never done business with Encinias, he established that Arriola and Encinias had visited his house together. Dax began selling methamphetamine for Arriola in March 2001. This was after Urbigkit was arrested but before Encinias began dealing in June or July 2001. This overlap in timing indicates that there was no "first" conspiracy involving Urbigkit and "second" conspiracy involving Encinias. A single conspiracy does not split into multiple conspiracies because members come and go. See United States v. Coleman, 7 F.3d 1500, 1503 (10th Cir. 1993) (sufficient evidence of defendant's participation in conspiracy even though she began her participation in the conspiracy two years after venture had begun, participated for only two months, and the conspiracy continued for six months after she was arrested); United States v. Brewer, 630 F.2d 795, 800 (10th Cir. 1980) ("A conspiracy is not terminated simply by a turnover in personnel.").

Finally, the trial court thoroughly instructed the jury on the government's burden of proving a single conspiracy. The court even revised the conspiracy instruction at the request of Encinias's counsel to include an instruction relevant

to the defense's multiple-conspiracy theory.[7] We are satisfied that the record supports the jury's verdict of guilty on the conspiracy count.

## V. Variance Between the Indictment and Proof at Trial

Encinias next asserts that "there was a fatal variance between the superseding Indictment, which charged a single conspiracy, and the government's proof at trial, which established multiple conspiracies." Appellant's Br. at 47. Again, Encinias contends that even if he conspired with Arriola and McQueary, the government failed to show that he was connected to Urbigkit, Thomas, Strong, Siegel, Dax, and Waite, as charged in Count One of the Indictment.

"A variance occurs when the evidence presented at trial establishes facts which are different from those alleged in the indictment." Dickey, 736 F.2d at 581. Such a variance is not fatal to the government's case unless it affects the "substantial rights" of the accused. Edwards, 69 F.3d at 432. The analysis begins with the determination of whether a variance occurred, Brewer, 630 F.2d at 800, followed by an examination of prejudice to the defendant, including whether there has been a "'transference of guilt to an accused from incriminating evidence

---

[7]The court included the following language: "[A] single conspiracy does not exist solely because many individuals deal with a common player. They must be interconnected in some way. What is required in this regard is a shared, single criminal objective, not just similar or parallel objectives between similarly situated people." Tr. of Jury Trial, R. Vol. 41 at 2047; id. at 2171.

presented in connection with the prosecution of another in the same trial for a crime in which the accused did not participate.'" Id. at 799 (quoting United States v. Morris, 623 F.2d 145, 149 (10th Cir. 1980)).

We therefore first turn to the issue of whether a single conspiracy existed, which is a fact question for the jury and which we review in the light most favorable to the government. Edwards, 69 F.3d at 432. The analysis is nearly identical to the discussion we engaged in to determine whether sufficient evidence supported the conspiracy conviction. "[T]he focal point of the [variance] analysis is whether the alleged co-conspirators were united in a common unlawful goal or purpose," and "[o]f principal concern is whether the conduct . . . however diverse and far-ranging, exhibits an interdependence." United States v. Daily, 921 F.2d 994, 1007 (10th Cir. 1990). We have already determined that one conspiracy existed in this case and do not reach the question of whether Encinias's substantial rights were affected. No fatal variance existed between the superseding Indictment and the government's evidence at trial.

## VI. Fair Trial

Encinias's final argument for reversal is that he was deprived of a fair trial by several references to the murder of Dennis Fisher and by a courtroom outburst

-38-

by McQueary's mother. Encinias's counsel did not raise the issue below, so we review for plain error.

Before trial, the district court ruled that evidence about Urbigkit's murder of Fisher would not be admitted at the trial of Encinias and Arriola. Yet several witnesses made inadvertent references to the event: Dax described Urbigkit as a "murderer" and briefly noted that he had been interviewed by a homicide detective, Tr. of Jury Trial, R. Vol. 34 at 979, 1003; Siegel stated that a murder had occurred in her apartment, id., R. Vol. 33 at 830; and McQueary said that Urbigkit was known as a "murderer." Id., R. Vol. 37 at 1379. Defense counsel did not object to any of this testimony at trial for fear of drawing unwarranted attention to the statements. The court and counsel agreed to remedy the problem by redacting references to the murder from the Indictment before it went to the jury.

Later, McQueary described how she untruthfully told Encinias that she had lied to the police in hopes of continuing a relationship with him. McQueary's mother at that point rose, and while "glaring" at Encinias, stated: "Her baby's dead and she was out of her mind. I'm her mother." Id., R. Vol. 36 at 1302. The judge told her to sit down and "keep her mouth shut." Id. at 1302-03. The judge then instructed the jury:

> The outburst that just occurred in this courtroom, of course, is unwarranted; and the reason it's so objectionable is that the

individual who spoke, who I'll identify here shortly and hold in contempt of court, made comments about the status of the evidence in this case. It's the kind of statement, of course, that you as judges of the facts must ignore altogether. I don't know what motivated her to make those comments, but they're not appropriate for you to consider.

Id. at 1308. After the jury was excused, the court found McQueary's mother in contempt of court, but did not fine or jail her. Again, the defense did not move for a mistrial and admitted that "the damage [was] done" and the judge "adequately instructed the jury." Id. at 1315.

While "a fair trial is the keystone of our entire judicial system," United States v. Cardall, 550 F.2d 604, 606 (10th Cir. 1976), a fair trial is not necessarily a perfect one. We have reviewed the record and are convinced that Encinias received a fair, if imperfect, trial despite these events, which were trivial in the context of more than thirty witnesses who testified over three weeks. See id. at 606 ("unjudicial" comments by judge were minor incidents in four-day trial in which thirty-two witnesses were called). The judge also properly instructed the jury after the outburst from McQueary's mother. We are therefore unpersuaded that a mistrial is warranted.

**CONCLUSION**

For all of the foregoing reasons, we AFFIRM Encinias's conviction.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge