**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 22, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

XAVIER ARRIOLA-PEREZ, also known as "X," also known as "ARI,"

Defendant - Appellant.

No. 03-8048

(D. Wyoming)

(D.C. No. 01-CR-99-D)

**ORDER AND JUDGMENT** *

Before **HARTZ** , **ANDERSON** , and **TYMKOVICH** , Circuit Judges.

Xavier Arriola-Perez, a/k/a "X," was convicted, following a three-week jury trial, of conspiracy to possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, and of possession with intent to distribute between 50 and 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

U.S.C. § 2. He was sentenced to 400 months in prison, followed by five years of supervised release, and a $5200 fine.

Arriola-Perez appeals his conviction, arguing (1) his case should have been dismissed because the government delayed in bringing him before a magistrate; (2) the trial court erred by refusing to exclude evidence of the violent arrest of an alleged coconspirator; (3) the trial court erred by admitting coconspirator hearsay statements without making formal findings as required by Fed. R. Evid. 801(d)(2)(E); and (4) he was denied his rights under the Confrontation Clause to confront statements made by his codefendant and an unindicted coconspirator. He also appeals his sentence, arguing that the judge improperly estimated the drug quantity upon which his sentence was based and that the judge engaged in judicial fact-finding in violation of United States v. Booker, 125 S. Ct. 738 (2005). For the reasons set forth below, we AFFIRM Arriola-Perez's conviction and sentence.

## BACKGROUND

The facts of this case are set out at length in a companion case, United States v. Encinias, 123 Fed. Appx. 924 (10th Cir. 2005) (unpublished), and we

incorporate them by this reference. [1] We therefore summarize many of the facts here and detail only those especially pertaining to Arriola-Perez.

On September 16, 2002, Arriola-Perez, Jason Thomas Encinias, and Steven Waite [2] were charged in an eleven-count superseding federal Indictment. The Indictment charged that they had conspired together and with a number of other individuals, including Samuel Urbigkit, Joseph Thomas, Crystal Siegel, Joseph Dax, Vanessa McQueary, and Brett Strong, to distribute methamphetamine in the District of Wyoming between March 2000 and December 2001. Waite was granted a severance, and Encinias and Arriola-Perez were tried together in a jury trial that began January 7, 2003. Most of the other individuals named as conspirators in the Indictment, including Siegel, Dax, McQueary, and Strong, were charged in separate proceedings, reached plea agreements with the prosecution, and testified against Arriola-Perez and Encinias at trial.

Arriola-Perez was charged in the Indictment with four counts besides those of which he was convicted, including: one count of possession and use of an AK-47-type rifle during and in relation to a drug-trafficking offense; one count of possession with intent to distribute approximately one pound of methamphetamine;

_____

[1] While we ordinarily do not cite unpublished opinions, we do so at various times here because this unpublished opinion directly relates to this case. See 10th Cir. R. 36.3.

[2] Waite also filed an appeal which is pending before this court, United States v. Waite, No. 03-8100 (10th Cir. filed June 10, 2003).

and two counts of using a telephone to facilitate a felony drug offense and aiding and abetting the use of a telephone to facilitate a drug-trafficking offense. The jury was unable to reach a verdict on the count of possession with intent to distribute, and it was subsequently dismissed; the jury acquitted Arriola-Perez of the other counts.

Testimony at trial, some of which is challenged as inadmissible hearsay on appeal, established the following facts. In 2000, Encinias, Arriola-Perez, Waite, Urbigkit, Strong, Thomas, and Dax were all incarcerated in the Wyoming State Penitentiary on charges unrelated to this case. Each of them was thereafter transferred at various times to a halfway house in either Casper or Cheyenne. While at the Cheyenne halfway house, Dax, Urbigkit, and Waite discussed plans to distribute methamphetamine when they were released. Dax testified that it was originally planned that he would manufacture the methamphetamine, but Urbigkit later told him that Arriola-Perez could furnish their drug supply.

Arriola-Perez moved to Denver upon release from the halfway house in August 2000. Testimony established that he began supplying distribution quantities of methamphetamine to Urbigkit when Urbigkit was released two months later. Brett Strong testified that he was Urbigkit's roommate at the halfway house and that after he was released, he sold about an ounce of methamphetamine a week for Urbigkit beginning in September 2000. On at least

two different occasions, Strong saw Arriola-Perez at Urbigkit's house, and Strong recounted seeing Arriola-Perez pull out a pound to a pound and a half of methamphetamine, which was "more than [Strong had] ever seen before." Tr. of Jury Trial at 435, R. Vol. 31. Urbigkit and Arriola-Perez then used a scale to weigh and divide the drugs. Strong witnessed Urbigkit at that time give Arriola-Perez a "pretty good-sized" stack of hundred-dollar bills. Id. at 436.

Crystal Siegel testified that she cleaned Urbigkit's apartment and was paid in money and drugs. She moved in with Joe Thomas, Urbigkit's friend, after Urbigkit told her he would pay her $500 a day to do so. She witnessed Thomas sell drugs, and saw Thomas receive methamphetamine from Urbigkit. Siegel said she worked as a "secretary" for the drug-distribution operation by keeping track of debts and by selling drugs from the apartment when Thomas was away. She also at one time transported a duffel bag containing three pounds of methamphetamine and a firearm from the apartment to Urbigkit's shop. Siegel testified that Urbigkit said "X" was his "main [drug] connection." Tr. of Jury Trial at 836, R. Vol. 33. Also, while cleaning Urbigkit's apartment, Siegel said she saw pieces of paper on which "X" and a phone number were written. She and Thomas on one occasion met Arriola-Perez at a motel room where they all got high together. Adam Schaff, another drug user and dealer, testified that over the course of several months, he

sold a total of a ten and a half pounds of methamphetamine for Thomas and Urbigkit.

In February 2001, Urbigkit was arrested in Casper after a dramatic shootout with police who were attempting to search his shop. Detailed and voluminous testimony from a number of law enforcement officers about the shootout, search, and arrest of Urbigkit was admitted at the trial over objections from both defendants. Police ultimately seized from the shop a scale, several firearms, including an AK-47-type gun, and around four pounds of methamphetamine, which was admitted as evidence at Arriola-Perez's trial. Police also discovered a piece of paper in the shop on which Arriola-Perez's name and phone number were written, and later testing showed Arriola-Perez's fingerprints were on the scale. Dax, another drug user and dealer, testified that Arriola-Perez told him that he "lost a lot of money when Sam [Urbigkit] got caught" because the drugs seized from the shop were his. Tr. of Jury Trial at 981, R. Vol. 34. Dax also testified that he visited Urbigkit while Urbigkit was incarcerated, and Urbigkit told him to tell Arriola-Perez that "he was sorry that all the drugs got caught out in the shop out there." Id. at 979.

Law enforcement also learned that Urbigkit had murdered Dennis Fisher, a man who owed him money, and placed his body in a barrel. The district court ordered that all information about the murder be suppressed at the trial. Urbigkit

was convicted in state court on charges stemming from his assault on the police officers and sentenced to five consecutive life sentences.

After Urbigkit's arrest, Arriola-Perez contacted Dax and Waite about selling methamphetamine. Dax testified that he shared a cell with Urbigkit and knew Encinias and Arriola-Perez while they were all in prison together. Dax testified that shortly after Urbigkit was arrested, he received a message at work from Arriola-Perez, who posed as his brother-in-law. The two met for lunch a few days later, at which time Arriola-Perez told him he "needed another source to get rid of some . . . dope" and "things were pretty hot in Casper." Id. at 959-60. Dax was still at the halfway house when he had lunch with Arriola-Perez, and, because he was still subject to searches and drug testing, he delayed becoming involved in the drug ring. However, only a few days after Dax's release from the halfway house in March 2001, he, Waite, Arriola-Perez, and several of Arriola-Perez's friends from California met at Waite's house. Arriola-Perez and his friends brought a pound of methamphetamine with them, which Waite and Dax split.

Dax testified that as time went on a pattern developed where he and Waite would split and sell a pound of methamphetamine delivered by Arriola-Perez each week. Dax would sometimes visit Arriola-Perez in Denver to pay him the proceeds from the sales, or Arriola-Perez would come to Wyoming to collect and deliver more drugs. This activity went on for five months, and Dax testified that

-7-

he and Waite ultimately dealt between twenty and twenty-five pounds of methamphetamine for Arriola-Perez. Dax testified that his and Waite's activities with Arriola-Perez ceased in August 2001 after Arriola-Perez showed up early to collect and threatened him with a gun.

Micole Smith, Dax's live-in girlfriend, testified that Dax said he got his methamphetamine from Arriola-Perez and that Arriola-Perez had been to her and Dax's apartment several times. She also stated that she traveled with Dax to Denver throughout the summer of 2001, and on one trip they delivered $3000 in "hundreds, fifties, [and] twenties" to Arriola-Perez. Tr. of Jury Trial at 1122, R. Vol. 36. She also recalled the August 2001 visit in which Arriola-Perez showed up to collect money and appeared "[v]ery agitated." Id. at 1132.

Encinias was the last of the group to be transferred to and then released from the halfway house. He was released in June 2001. Encinias and Vanessa McQueary met July 12, 2001, in Casper. McQueary testified that a few days later, she traveled with Encinias and several others to Denver for the purpose of buying drugs from Arriola-Perez. McQueary testified that after they arrived at the Ramada Inn in Denver, Encinias made several phone calls and said he was calling Arriola-Perez. Phone records admitted into evidence corroborate that calls were made between a phone belonging to Arriola-Perez and a phone associated with Encinias's motel room at this time. Arriola-Perez, Encinias, and McQueary then

met in the parking lot of the motel. Encinias left the motel for an extended period of time and later told McQueary that he had traveled to Cheyenne with Arriola-Perez to pick up some drug money. The stay at the Ramada Inn during the period in question was corroborated by motel receipts, offered into evidence, and a picture identification card Encinias allowed motel personnel to copy.

McQueary stated that she and Encinias arrived back in Casper with twenty-four ounces of methamphetamine. Half of the twenty-four ounces was delivered by Encinias and McQueary to Zeb Carrick, another dealer who had previously given Encinias money for the drugs and whose sister was romantically involved with Arriola-Perez. Phone records show calls were made between a phone belonging to Encinias and a phone belonging to Arriola-Perez after Encinias returned to Casper. McQueary testified that this call was to get Carrick's address in preparation for the delivery. McQueary and Encinias distributed the methamphetamine until Encinias was arrested by police, who had received two anonymous telephone tips that Encinias would be traveling from Colorado to Casper with a kilo of methamphetamine. McQueary testified that before she herself was arrested a little while later, she called Arriola-Perez several times from a cell phone to seek his advice on bailing Encinias out of jail. Arriola-Perez told her not to call him on a cell phone and said that he could not help because all of his money was tied up in unsold drugs in Wyoming. Two searches conducted in

connection with the arrest of Encinias, then McQueary, yielded evidence of drug trafficking, such as firearms, scales, and drugs.

On August 3, 2001, during a short hiatus from jail, Encinias visited the apartment of Amanda Hale, who was dating one of Encinias's friends. Hale testified that Encinias asked her to hold a pound rock of methamphetamine for him and also told her that his drug source was in Denver.

After Encinias was back in jail, he received a visit from federal Alcohol, Tobacco and Firearms Agent Daniel Raponi and state Division of Criminal Investigation Agent Mark Sellers. Encinias was read his _Miranda_ rights but nonetheless voluntarily told Raponi and Sellers that he was a methamphetamine dealer, had possessed several firearms, and that his source was dating Zeb Carrick's sister. Encinias sought to suppress his statements before trial, but the judge denied the motion (which Encinias did not appeal), and both Raponi and Sellers told the jury about Encinias's admissions.

Arriola-Perez was indicted by a grand jury on September 27, 2001, and was arrested in Denver on December 10, 2001, by local and federal law enforcement agents working together. He had initially been charged by Denver authorities on March 1, 2001, with possession of drug paraphernalia and failure to provide proof of insurance. He did not appear in court on those charges, resulting in warrants for his arrest, issued in March and again in July. When Arriola-Perez was arrested

in December, he was immediately turned over to local authorities when the arresting officers discovered that he was wanted on the outstanding state warrants. Federal marshals then filed a federal detainer on the federal charges out of Wyoming. Arriola-Perez pleaded guilty to the state charges and served a five-day sentence, but for reasons not explained in the record, he continued to remain in state custody until January 18, 2002, approximately thirty-five days after his local sentence had been completed. On that day, he was transferred to federal custody and was brought before a federal magistrate for an initial appearance. Arriola-Perez filed a pretrial motion to dismiss because of the delay in bringing him before a federal magistrate following his arrest on December 10, 2001. The agent who testified at a pretrial hearing on the motion could not offer any explanation why Arriola-Perez stayed in state custody, even after he had completed his local sentence, until January 18. The agent did testify that neither state nor federal authorities visited Arriola-Perez during this time to obtain a confession, and no statement was obtained from Arriola-Perez. The district court denied the motion.

## DISCUSSION

## A.

## I. Delay in Bringing Arriola-Perez Before a Magistrate

Arriola-Perez first contends that the district court erred by denying his pretrial motion to dismiss due to the delay in bringing him before a federal magistrate following his arrest on December 10, 2001. Fed. R. Crim. P. 9(c)(1) requires that the arresting officer "take the defendant without unnecessary delay before a magistrate judge." [3] This rule does not apply when a defendant is in state custody and it is not triggered until "the accused is taken into federal custody." United States v. Torres, 663 F.2d 1019, 1023 (10th Cir. 1981). See also United States v. Ireland, 456 F.2d 74, 77 (10th Cir. 1972); Daro v. United States, 380 F.2d 23, 25 (10th Cir. 1967). There is an exception, however, when a delay is pursuant to a "working arrangement" between federal and state authorities and state custody is used to obtain a confession. In that instance, state custody is treated as federal custody for the purposes of Fed. R. Crim. P. 9(c)(1) and 5(a)(1). Torres, 663 F.2d at 1024. The typical remedy for a violation of 9(c)(1) or 5(a)(1) is suppression of any confession obtained during the period of delay. Walton v. United States, 334 F.2d 343, 346 (10th Cir. 1964) (citing Mallory v. United States, 354 U.S. 449, 453

---

[3]Fed. R. Crim. P. 9(c)(1), which applies to arrests made pursuant to an indictment, incorporates by reference the language of Fed. R. Crim. P. 5(a)(1), which applies to arrests made pursuant to a warrant or a complaint.

-12-

(1957)).  We review the district court's interpretation of Rule 9(c)(1) de novo, United States v. Roman-Zarate, 115 F.3d 778, 781 (10th Cir. 1997), and its factual determinations for clear error.  Manning v. United States, 146 F.3d 808, 812 (10th Cir. 1998).

Here, as indicated, Arriola-Perez contends that the approximately thirty-nine day period between his arrest on December 10, 2001, and his initial appearance before a federal magistrate on January 18, 2001, constitutes unnecessary delay.  But because the only evidence in the record supports the fact that Arriola-Perez was not in federal custody but in state custody during that period, it is not counted for purposes of Rule 9(c)(1).  Once he was taken into federal custody, it was only a matter of hours before Arriola-Perez appeared before a federal magistrate.  Arriola-Perez has not pointed to any evidence that there was collusion between state and federal authorities.  In fact, a government witness testified that Arriola-Perez did not receive a visit from either state or federal officials during this period, and Arriola-Perez's counsel conceded this fact at the pretrial hearing.  Because neither federal custody nor a working arrangement took place during this time, Rule 9(c)(1) was not violated, and the district court did not err in denying Arriola-Perez's motion to dismiss. [4]

_____

[4]The facts of this case do not require us to opine on the disputed question, not yet addressed by this court, whether a violation of Rule 5(a)(1) or Rule 9(c)(1)

(continued...)

-13-

## II.    Evidence of an Alleged Coconspirator's Violent Arrest

Arriola-Perez next challenges the district court's failure to exclude evidence of the violent arrest of unindicted coconspirator Sam Urbigkit.  Officers testified that when they attempted to search Urbigkit's shop, Urbigkit struck one officer with his vehicle, then fled on foot.  While fleeing, Urbigkit fired several shots at the officers.  Officers ultimately shot and wounded Urbigkit and he was arrested.  Officers found a Glock pistol and methamphetamine near the place where Urbigkit went down.  As noted above, the search of the shop yielded approximately four pounds of methamphetamine, several firearms, including an AK-47-type weapon, and a scale.  All of these items, including the Glock and the drugs from Urbigkit's person, were admitted at Arriola-Perez's trial.

Before this evidence was admitted, the court recognized its potential prejudicial effect and asked the prosecutor what it was to be used for.  He responded that he offered it intending to get into evidence the "drugs and guns which were near [Urbigkit's] person and in the shop."  Tr. of Jury Trial at 495, R.

---

[4](...continued)
is grounds for dismissal as well as suppression of an illegally obtained confession.  As noted above, no confession was obtained in this case, so suppression is not the remedy Arriola-Perez seeks.  Rather, he seeks dismissal of the entire Indictment.  Courts disagree about whether Rule 5(a) permits this.  See, e.g., United States v. Melendez, 55 F. Supp. 2d 104, 107-08 (D. P.R. 1999) (describing disagreement among courts, citing cases, and ultimately holding that a violation of Rule 5(a)(1) may warrant dismissal under limited circumstances).

Vol. 32.  The court later ruled that the Urbigkit evidence was part of the conspiracy in which Arriola-Perez had participated.  The judge concluded that "[h]owever prejudicial it might be, it's even more relevant, and that's the reason I've permitted it to come in."     Id. at 592.  Later, the trial judge, still mindful of possible prejudice, instructed the jury:

> [T]here was testimony this morning regarding incidents surrounding the apprehension of Mr. Sam Urbigkit.  Mr. Urbigkit's name, as you know from reading the indictment, is mentioned in the indictment as allegedly being an unindicted co-conspirator of these defendants.  That is merely an allegation. It's the government's burden to prove those allegations.
>
> You and you alone will determine whether this evidence of the apprehension of Mr. Urbigkit, the guns that were found at the scene of Mr. Urbigkit's residence and his shop, the drugs that were testified as being recovered at the scene of those events—you and you alone will decide ultimately whether those items, those pieces of evidence, are somehow tied credibly to an alleged conspiracy in which Mr. Urbigkit was a participant with these defendants.
>
> You may, at the end of all of the evidence, conclude that they're not tied in.  You may conclude that they are.  That is for you and you alone to decide. I don't want you to think, when I receive evidence, that I'm telling you that it deserves—that it's being received for an indication to you that I think that evidence points to the guilt of any particular defendant.  I'm not receiving it for that purpose at all.  I'm letting it be received for you to consider.  Give it what weight you wish.

Id. at 632-33.

Arriola-Perez first contends that the Urbigkit testimony was admitted in violation of Fed. R. Evid. 404(b), which provides that "[e]vidence of other crimes,

-15-

wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Arriola-Perez argues that the court allowed evidence of the crimes of Urbigkit, a nonparty, to prove that Arriola-Perez had bad character or similarly engaged in violent activities.

The language of Rule 404(b), however, suggests that the rule is violated only when a court admits prior bad acts of the <u>defendant</u> solely to prove the <u>defendant's</u> character. Arriola-Perez cites no authority for a general proposition that evidence of the bad acts of a third party is inadmissible under Rule 404(b) due to a spillover effect which assertedly proves that the defendant had a bad character. And, as indicated above, the government, in any event, did not introduce the disputed evidence for such a purpose. [5]

Arriola-Perez next contends that the admission of the Urbigkit evidence violated Fed. R. Evid. 403, which states that evidence, even if relevant, may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

---

[5]Alternatively, even if we were to assume that by some stretch Fed. R. Evid. 404(b) applied to this scenario, we would nonetheless conclude that the admission of the Urbigkit evidence did not violate this rule because it was intrinsic evidence of the charged conspiracy. Only extrinsic evidence is excludable under Rule 404(b). <u>See, e.g.</u>, <u>United States v. Green</u>, 175 F.3d 822, 831 (10th Cir. 1999).

Arriola-Perez argues that the evidence was confusing to the jury, was more prejudicial than probative, and that the judge failed to articulate his balancing-test rationale before admitting the evidence under this rule. He also argues, alternatively, that the evidence was "not relevant to the issue of whether or not Mr. Arriola-Perez was involved in a conspiracy to distribute methamphetamine." Appellant's Br. at 7.

Rule 403 does not protect a party from all prejudice, only unfair prejudice. Deters v. Equifax Credit Info. Servs., 202 F.3d 1262, 1274 (10th Cir. 2000). "In performing the 403 balancing, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." Id. (internal quotation omitted). The district court is given broad discretion in making this determination because it is "clearly in a superior position to perform this analysis." Id. We review the admission of evidence under Rule 403 for an abuse of discretion, United States v. Flanagan, 34 F.3d 949, 952 (10th Cir. 1994), and, for the reasons stated below, conclude that the court did not abuse its discretion in admitting the challenged evidence.

First, contrary to Arriola-Perez's assertion, and even though not technically required, see United States v. Lazcano-Villalobos, 175 F.3d 838, 846-47 (10th Cir. 1999), the court articulated a balancing analysis, as indicated above. The court considered the objections and the evidence in question, and ruled that it was more

probative than prejudicial, stating: "However prejudicial it might be, it's even more relevant, and that's why I've permitted it to come in." Tr. of Jury Trial at 592, R. Vol. 32.

That ruling is supported by the evidence. The shootout began when officers attempted to find direct evidence of the conspiracy, i.e., the guns and drugs that were hidden in Urbigkit's shop. The testimony concerning the shootout also helped explain how police recovered the gun and methamphetamine from Urbigkit's person. Testimony by Dax tied the Urbigkit drugs directly to Arriola-Perez. The eventual search of the shop revealed a piece of paper on which Arriola-Perez's phone number was written and a scale on which Arriola-Perez's fingerprints were found.

Additionally, the judge gave the lengthy limiting jury instruction quoted above. See United States v. Cass, 127 F.3d 1218, 1225 (10th Cir. 1997) (holding that admission of prejudicial evidence under Rule 403 was not reversible error because court gave limiting instruction and "cautionary instructions are ordinarily sufficient to cure any alleged prejudice to the defendant"). We presume that a jury follows a court's instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000); Battenfield v. Gibson, 236 F.3d 1215, 1225 (10th Cir. 2001). In this case, we have more than a presumption; the government correctly points out that Arriola-Perez was acquitted of several charges, including the only firearms count with which he

was charged. This suggests that the evidence of Urbigkit's pervasive gun use did not prejudice Arriola-Perez. Finally, for the reasons already explained, we reject Arriola-Perez's argument that the evidence should have been excluded because it was irrelevant.

### III. Coconspirator Hearsay Statements

Arriola-Perez next argues that the district court erred by admitting coconspirator hearsay statements under Fed. R. Evid. 801(d)(2)(E)[6] without making the formal findings we require. Those findings are: (1) that by a preponderance of the evidence a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) that the statements were made in the course of and in furtherance of the conspiracy. United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995) (citing United States v. Urena, 27 F.3d 1487, 1490 (10th Cir. 1994) (further quotation omitted)).

Arriola-Perez objected to the following testimony at trial and challenges its admissibility on appeal:

- Crystal Siegel's testimony that Urbigkit said he got his drugs from "a guy named X"

---

[6]Rule 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Fed. R. Evid. 801(d)(2)(E).

- Testimony from Micole Smith, Adam Schaff, Joseph Dax, and Brett Strong recounting the activities and statements of Urbigkit regarding Arriola-Perez's participation in the conspiracy
- McQueary's testimony that Encinias told her that his drug partner was "X"

Appellant's Br. at 8-14. We considered at length and rejected an almost identical argument in Encinias's appeal, United States v. Encinias, 123 Fed. Appx. 924 (10th Cir. 2005) (unpublished). The only difference between the 801(d)(2)(E) arguments of the two codefendants is that Arriola-Perez challenges the admission of Siegel's and Smith's testimony in addition to the coconspirator testimony challenged by Encinias. Still, Encinias and Arriola-Perez both primarily challenge the admission of statements of which Encinias and Urbigkit are the declarants.[7] We noted in Encinias that the trial court did make a formal finding that a conspiracy existed and that Arriola-Perez was a member of the conspiracy; its technical oversight was in failing to make an express finding on the record that Urbigkit and Encinias were coconspirators and that each of the challenged statements was made in the course of or in furtherance of the conspiracy. We carefully considered the 801(d)(2)(E) argument in Encinias's appeal and explained

[7]Arriola-Perez suggests that the trial judge erred by not formally finding that the witnesses, including Siegel, Smith, Dax, and McQueary, were coconspirators. This argument misunderstands the rule. "There is no requirement that a witness be a member of the conspiracy before he can testify about statements made by participants in the conspiracy," rather, all that must be shown is "that the declarant and defendant were members of the conspiracy." United States v. Molina, 75 F.3d 600, 603 (10th Cir. 1996) (emphasis added).

why the court properly admitted the evidence. Arriola-Perez's 801(d)(2)(E) argument fails for the same reasons. Much of the testimony Arriola-Perez complains of is admissible on other grounds, for example, as admissions made by a defendant, United States v. Gonzalez-Montoya, 161 F.3d 643, 648 (10th Cir. 1998), or as direct testimony of a coconspirator describing his or her participation in the criminal venture. United States v. Mobile Materials, Inc., 881 F.2d 866, 871 (10th Cir. 1989).

Furthermore, as noted in Encinias, this circuit has held that "a case could arise in which the record demonstrates without any question that the trial court did make the requisite inquiry even though no formal findings appear. . . . In [this] event, a remand would not be necessary." United States v. Perez, 989 F.2d 1574, 1582 n.3 (10th Cir. 1993) (en banc). This is such a case where we can infer that the judge made the functional equivalent of findings under Rule 801(d)(2)(E) because, as more fully explained in Encinias, the judge repeatedly expressed concern that the Rule's requirements were complied with, outlined the procedure it would follow in admitting coconspirator statements, and then overruled the motion for a judgment of acquittal and submitted the case to the jury on the entire trial record.

Alternatively, even assuming, arguendo, that certain of the challenged statements should not have been admitted in the absence of findings, we conclude

-21-

that the error was harmless because it did not have "a 'substantial influence' on the outcome" or leave us "in 'grave doubt' as to whether it had such an effect." United States v. Cestnik, 36 F.3d 904, 910 (10th Cir. 1994) (quoting United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) (further quotation omitted)).  The coconspirator statements were, at best, comparatively small in the face of the overwhelming evidence against Arriola-Perez, which included:  (1) direct testimony of Brett Strong, who made an in-court identification of Arriola-Perez, that he saw Arriola-Perez pull out a pound of methamphetamine at Urbigkit's house, and that he saw Urbigkit give Arriola-Perez a stack of $100 bills; (2) direct testimony of Joseph Dax, who also made an in-court identification of Arriola-Perez, that Arriola-Perez contacted him about selling methamphetamine, that he distributed up to twenty-five pounds of methamphetamine for Arriola-Perez, and that he traveled to Denver to pay Arriola-Perez; (3) direct testimony of Micole Smith, who also made an in-court identification of Arriola-Perez, that she traveled to Denver with Dax on numerous occasions and, on one such occasion, they paid Arriola-Perez $3000 in cash; (4) direct testimony from McQueary, who also made an in-court identification of Arriola-Perez, that she and Encinias met Arriola-Perez in the parking lot of a Denver hotel and that she called Arriola-Perez for help after Encinias got arrested; (5) corroborating evidence of phone records showing calls, made during periods of key transactions, between phones belonging

to Arriola-Perez and phones belonging to other conspirators, thus demonstrating a link between them; (6) the scale seized from Urbigkit's shop on which Arriola-Perez's fingerprints were found; and (7) drugs seized from Urbigkit's shop and from McQueary, which testimony linked to Arriola-Perez.

While addressing 801(d)(2)(E) in his brief, Arriola-Perez makes a passing reference to the argument that multiple conspiracies, if any, existed in this case rather than the single conspiracy charged in the Indictment. Yet Arriola-Perez fails to address such an issue under a separate heading or to develop the argument in any meaningful way. The court will typically not consider an issue raised on appeal but not adequately addressed. Wilburn v. Mid-South Health Dev., Inc. , 343 F.3d 1274, 1281 (10th Cir. 2003). To the extent it merits our consideration, there was overwhelming evidence that Arriola-Perez was the hub of this drug conspiracy. Moreover, a single conspiracy does not become multiple conspiracies simply because members come and go. See United States v. Coleman , 7 F.3d 1500, 1503 (10th Cir. 1993); United States v. Brewer , 630 F.2d 795, 800 (10th Cir. 1980). We also again refer to United States v. Encinias , in which we rejected this argument and explained our reasoning at length. [8]

---

[8]Arriola-Perez raises several other arguments which we briefly mention here. First, he asserts that the judge failed to inquire into the reliability of the coconspirator hearsay statements before admitting them. Such an argument shows a misunderstanding of the law. The Supreme Court in Bourjaily v. United States,

(continued...)

## IV.    Confrontation Clause

Finally, Arriola-Perez argues he should receive a new trial because he was unable to confront statements made by Encinias, his nontestifying codefendant, and by Urbigkit, who also did not testify.  He challenges (1) the admission of Encinias's voluntary statement to law enforcement officers that he was a drug dealer and that his source was dating Zeb Carrick's sister, and (2) the testimony of McQueary and other coconspirators recounting statements made by Encinias and Urbigkit.  Arriola-Perez contends that the admission of all of these statements violated  Bruton v. United States  , 391 U.S. 123 (1968).  We review this issue      de novo.  United States v. Verduzco-Martinez    , 186 F.3d 1208, 1212 (10th Cir. 1999).

-----

[8](...continued)
483 U.S. 171 (1987), expressly held that because 801(d)(2)(E) was firmly rooted in federal jurisprudence, "a court need not independently inquire into the reliability of [coconspirator] statements." Id. at 183.

In addition, Arriola-Perez's appellate counsel asserted at oral argument that the Supreme Court's holding in the case of Crawford v. Washington, 541 U.S. 36 (2004), trumps the Fed. R. Evid. 801(d)(2)(E) hearsay exclusion. Crawford held that the Sixth Amendment bars out-of-court statements by witnesses that are testimonial in nature unless the witnesses are unavailable and the defendant had a prior opportunity for cross-examination. Id. at 68. Here, however, we are considering out-of-court statements made in furtherance of a conspiracy, which have historically been considered nontestimonial, see id. at 56, because "co-conspirator statements simply cannot be replicated, even if the declarant testifies to the same matters in court. Because the statements are made while the declarant and the accused are partners in an illegal enterprise, the statements are unlikely to be false and their admission actually furthers the Confrontation Clause's very mission which is to advance the accuracy of the truth-determining process in criminal trials." Id. at 73 (Rehnquist, C.J., concurring) (internal quotations omitted).

The admission of a nontestifying codefendant's confession implicating the defendant at their joint trial violates the defendant's Sixth Amendment Confrontation Clause rights. <u>Bruton</u>, 391 U.S. at 137; <u>United States v. Sarracino</u>, 340 F.3d 1148, 1159-60 (10th Cir. 2003), <u>cert. denied</u>, 540 U.S. 1131 (2004). Even if the jury is instructed to consider the confession only against the codefendant, "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." <u>Bruton</u>, 391 U.S. at 1627.

As indicated above, when officers investigating a possible federal firearms violation contacted Encinias to obtain his fingerprints, Encinias volunteered information about his methamphetamine dealing. At trial, Agent Sellers described the exchange between Encinias and the officers as follows:

> [MR. BARRETT (the prosecutor)]: Was there any further questioning or statements by Mr. Encinias concerning drug dealing?
>
> [MR. SELLERS]: Yes. He stated that he was in debt to his source for a certain amount of money, and I don't recall the exact amount of money.
>
> [MR. BARRETT]: Okay. <u>Did he name the source?</u> <u>Did he give a name for his source?</u>
>
> [MR. SELLERS]: <u>No, he did not.</u>

Tr. of Jury Trial, R Vol. 33 at 714 (emphasis added).

-25-

Then, the following exchange was elicited by defense counsel on cross-examination:

[MR. SEDAR (Arriola-Perez's counsel)]: During the entire interview that you did with [Encinias], he never mentioned my client, did he?

[MR. SELLERS]: He mentioned him but not by name.

[MR. SEDAR]: So as a police officer,    you're willing to take that leap?

[MR. SELLERS]: I guess I do not understand the question.

[MR. SEDAR]: Well, I said he never mentioned my client, and you said he mentioned him, just not by name.

[MR. SELLERS]: Yes.  That is what I said.

[MR. SEDAR]:   Explain that to me.

[MR. SELLERS]: Mr. Encinias, when talking about him and Zeb Carrick's source, stated his source was Zeb—dating Zeb Carrick's sister which we    now know to be . . . Mr. Arriola-Perez    .

[MR. SEDAR]: Oh, dating Zeb Carrick's sister.  Did you know that my client was married?

[MR. SELLERS]: Yes, I do.

. . .

[MR. SEDAR]: His source was dating Zeb Carrick's sister.  He was willing to tell you that.    Why didn't you tell the jury that?

[MR. SELLERS]: I believe I just did tell the jury that, sir.

[MR. SEDAR]:   Why didn't you tell them in your direct?

-26-

[MR. SELLERS]:   'Cause it was not asked of me.

[MR. SEDAR]:  Okay.  So if somebody else was dating Zeb Carrick's sister, would you think that they were the source?

[MR. SELLERS]:  At the time and place from the understanding that's been told and    the information received now    is that Mr. Arriola-Perez was dating Zeb Carrick's sister at that time.

[MR. SEDAR]:  Oh, okay.  And you worked on that assumption and built your whole case or your whole ideology of my client's guilt over that?

[MR. SELLERS]:  I would say "no" to that.  I believe it's a lot more.

Id. at 717-19 (emphasis added).

Arriola-Perez characterized the foregoing as an identification of Arriola-Perez as Encinias's source, which he says was "inadvertently introduced by a law enforcement officer on cross-examination."  Appellant's Br. at 20.  To the contrary, however, as the transcript shows, Arriola-Perez's counsel himself elicited this testimony. [9]  The identification of Arriola-Perez was in response to defense counsel's persistent questioning as to whether Arriola-Perez was mentioned in Sellers' interview with Encinias.  Then, upon receiving an ambiguous response, Arriola-Perez's counsel asked for further explanation, at which time Sellers

[9]The conversation between Encinias, Agent Sellers, and Agent Raponi surfaced again when the prosecution conducted its direct examination of Raponi. Arriola-Perez, however, does not appeal the admission of Raponi's testimony that "[Encinias] stated that his source was dating Zeb Carrick's sister."  Tr. of Jury Trial at 1672, R. Vol. 38.

referenced Arriola-Perez by name. The record demonstrates that the defense's questions were an attempt to challenge the truthfulness of Sellers' testimony because Sellers had not named Arriola-Perez on direct examination.

It is well established that an appellant may not generally complain on appeal of errors he has himself induced or invited. Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1332 (10th Cir. 1996); Gundy v. United States, 728 F.2d 484, 488 (10th Cir. 1984). Several circuits have applied the principle of invited error in rejecting a Bruton argument on appeal. See, e.g., United States v. Jernigan, 341 F.3d 1273, 1290 (11th Cir. 2003) (appellant invited Bruton error by stipulating to the admission of tape containing codefendant's implicating statements); United States v. Reyes-Alvarado, 963 F.2d 1184, 1187 (9th Cir. 1992) ("[A] defendant who elicits a statement that may be violative of Bruton may not later claim error based on the admission of that statement.").

Alternatively, even assuming arguendo that any Bruton error occurred, it was harmless beyond a reasonable doubt. [10] Chapman v. California, 386 U.S. 18, 24 (1967); Sarracino, 340 F.3d at 1160. Once the challenged testimony was

_____

[10]Crawford, discussed in footnote nine, supra, does not suggest that Confrontation Clause errors are structural and therefore not subject to harmless-error review. We thus continue to apply the harmless beyond a reasonable doubt standard. See, e.g., United States v. Lee, 374 F.3d 637, 645 (8th Cir. 2004), petition for cert. filed (U.S. Feb. 18, 2005) (No. 04-8773); United States v. McClain, 377 F.3d 219, 222 (2d Cir. 2004).

elicited, the judge halted the trial and engaged in a lengthy colloquy with counsel about how to remedy the problem. The trial court then determined that it would instruct the jury, and did so as follows:

> Ladies and gentlemen of the jury, you heard some testimony from Officer Sellers this morning about a statement that he took from the defendant Jason Encinias. I instruct you that you may consider the testimony concerning the statement as against Mr. Encinias—you can consider it against his interests if you wish . . . and use it as you see fit.
> Nevertheless, you are instructed that you are not to consider that statement as proof of anything as it relates to Mr. Arriola-Perez-Perez. It cannot be assumed that it relates to his guilt or innocence. It's not . . . a statement directed to him, and you cannot consider it for that purpose.

Tr. of Jury Trial at 779, R. Vol. 33. We presume the jury followed the court's instruction.

Finally, and furthermore, even if one were to conclude that the jury failed to adhere to the court's instruction, that failure still was not "vital" to the defendant. Bruton, 391 U.S. at 1627. Again, Encinias's admissions were insignificant in light of the overwhelming evidence against Arriola-Perez, described above.

Arriola-Perez next challenges the testimony of McQueary and other coconspirators. This contention, however, is precluded by Bourjaily, in which the Supreme Court stated that the requirements for admission under Fed. R. Evid. 801(d)(2)(E) are identical to the requirements of the Confrontation Clause. Bourjaily, 483 U.S. at 182. If "statements are admissible under [Rule

-29-

801(d)(2)(E)], there [is] no constitutional problem." Id. It follows that "there can be no separate Confrontation Clause challenge to the admission of a co-conspirator's out-of-court statement." Id. at 183 (citing Delaney v. United States, 263 U.S. 586, 590 (1924)). We have already determined that these statements were admissible under Rule 801(d)(2)(E), as discussed above and at length in United States v. Encinias. Arriola-Perez's Confrontation Clause challenge to these statements accordingly fails.

**B.**

Arriola-Perez challenges his sentence on two grounds. First, he asserts what is essentially a sufficiency-of-the-evidence argument, contending that the evidence does not support the district court's calculation of the drug quantity upon which his sentence was based. Second, he argues that his sentence was imposed in violation of the Sixth Amendment, because the judge, rather than the jury, made factual findings regarding drug quantity and his role as a ringleader, which

resulted in a substantial enhancement to his sentence.[11] See United States v. Booker, 125 S. Ct. 738 (2005).[12]

In Booker, the Supreme Court also ruled that the United States Sentencing Guidelines were not mandatory, thus freeing the district court to exercise discretion, within limits, in imposing sentence. Errors under this second part of Booker are non-constitutional in nature. It is important to note at this juncture that Arriola-Perez fails to separately raise and develop an argument regarding non-constitutional Booker error. See United States v. Gonzalez-Huerta, 403 F.3d 727, 731-32 (10th Cir. 2005) (en banc) (discussing the difference between constitutional and non-constitutional Booker error). Nevertheless, even if we were to assume arguendo that a non-constitutional Booker error had been raised, our analysis of the Sixth Amendment issue below makes it clear that that argument would fail, regardless of the standard of review applied.

---

[11]The district court arrived at the defendant's sentence in the following manner: applying United States Sentencing Commission, Guidelines Manual ("USSG") §2D1.1(c)(1) (Nov. 2002), the district court determined that Arriola-Perez's base offense level was 38 because he was responsible for distributing more than fifteen kilograms of methamphetamine, significantly more than was charged in the superseding Indictment. The court also applied a four-level enhancement for Arriola-Perez's role as a leader/organizer, bringing his total offense level to 42. With a criminal history category of IV, the USSG called for a sentence of 360 months' to life imprisonment.

[12]The Supreme Court had not issued Booker at the time of Arriola-Perez's sentencing. We ordered supplemental briefing on the effect of Booker and subsequent Tenth Circuit decisions on this case, and the parties have filed those briefs.

## I.    Drug Quantity Calculation

At the sentencing hearing, the district court agreed with the presentence report that Arriola-Perez was responsible for distributing fifteen kilograms or more of methamphetamine. The court found that because Arriola-Perez had been convicted of the conspiracy charge, he was responsible for all of the acts of his coconspirators in the jointly undertaken criminal venture. During the trial, a police officer summarized the testimony of the coconspirators and concluded that Arriola-Perez was responsible for the distribution of more than thirty-six pounds, or approximately sixteen kilograms, of methamphetamine—including the twenty pounds sold by Dax; ten pounds sold by Schaff; one pound seen by Strong in Arriola-Perez's possession; four pounds seized from Urbigkit's shop; and one pound placed by Encinias in Hale's purse.

We review a district court's factual findings for clear error. United States v. Brown, 314 F.3d 1216, 1222 (10th Cir.), cert. denied, 537 U.S. 1223 (2003). In sentencing, factual findings regarding drug quantities are reversed "only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." United States v. Ryan, 236 F.3d 1268, 1273 (10th Cir. 2001) (further quotation omitted).

"When the actual drugs underlying a drug quantity determination are not seized, the trial court may rely upon an estimate to establish the defendant's

guideline offense level 'so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of reliability.'" United States v. Ruiz-Castro , 92 F.3d 1519, 1534 (10th Cir. 1996) (quoting United States v. Wacker , 72 F.3d 1453, 1477 (10th Cir. 1995) (further quotation omitted)). However, the "need to estimate drug quantities at times is not a license to calculate drug quantities by guesswork." United States v. Richards , 27 F.3d 465, 469 (10th Cir. 1994) (further quotation omitted). Furthermore, "[a] defendant convicted of conspiracy is accountable for reasonably foreseeable conduct in furtherance of the jointly undertaken criminal activity." United States v. Dazey , 403 F.3d 1147, 1176 (2005); see also USSG §1B1.3(a)(1)(B) (2002) (in the case of a jointly undertaken criminal activity, base offense level should be determined based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity"). For sentencing purposes, the government must prove the amount of drugs attributable to the defendant by a preponderance of the evidence. United States v. Lauder , No. 04-2120, __ F.3d __, 2005 WL1349974, at *10 (10th Cir. June 8, 2005).

Arriola-Perez vigorously contested the methamphetamine quantity determination at the sentencing hearing and in objections to the presentence report. He continues to argue on appeal that the testimony of certain trial witnesses should be discounted: first, because he was acquitted of a number of the counts against

him, and second, because in the second count of which he was convicted, the jury determined that he was guilty of possessing and distributing between 50 and 500 grams where the government had argued that he possessed and distributed more than 500 grams. Arriola-Perez contends that these verdicts show that the jury did not believe certain coconspirator testimony, and therefore the quantities described by the coconspirators were inaccurate.

We disagree. The defendant's argument ignores the fact that he was convicted of the primary charge against him, conspiracy to distribute more than 500 grams of methamphetamine. The superseding Indictment specifically named Arriola-Perez, Encinias, Urbigkit, Thomas, Siegel, McQueary, Dax, and Strong as coconspirators, so the jury apparently believed the evidence that these individuals were all involved in the jointly undertaken criminal activity. Ample testimony established that Arriola-Perez was the supplier of drugs for this conspiracy. It is therefore abundantly clear that Arriola-Perez was directly involved with the quantities testified to by the coconspirators and that the activities of the coconspirators in distributing these drugs were reasonably foreseeable acts. The district court's calculation of the drug quantity underlying Arriola-Perez's sentence was not erroneous.

## II.    Sixth Amendment Claim

In United States v. Booker , the Supreme Court held, in part, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Booker , 125 S. Ct. at 756. Here, because the judge determined facts regarding drug quantity and Arriola-Perez's status as a leader, and then increased Arriola-Perez's punishment based upon those judge-found facts, the sentence violated the Sixth Amendment.

The government concedes, and we agree, that our review of the constitutional error is for harmlessness because Arriola-Perez preserved the issue. He objected to the recommendations in the presentence report, arguing that the sixteen-kilogram drug quantity estimation and the four-level enhancement for being a leader or organizer were improper because they were not found by a jury, in violation of Apprendi v. New Jersey , 530 U.S. 466 (2000). See United States v. Riccardi , 405 F.3d 852, 874-75 (10th Cir. 2005); United States v. Windrix , 405 F.3d 1146, 1158 (10th Cir. 2005).

Fed. R. Crim. P. 52(a) provides: "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." See also United States v. Labastida-Segura , 396 F.3d 1140, 1142 (10th Cir. 2005). In the case of a

constitutional Booker error reviewed for harmlessness, the burden is on the government to prove that the error is harmless beyond a reasonable doubt. United States v. Lang, 405 F.3d 1060, 1065 (10th Cir. 2005); Windrix, 405 F.3d at 1158. In analyzing whether a preserved constitutional Booker error is harmless, we have considered various factors, including whether overwhelming evidence supports the district court's factual findings and whether the district court would have imposed a less severe sentence had it known it had discretion. Riccardi, 405 F.3d at 875-76.

The government has met its burden in this case. The prosecution points out that at the sentencing hearing, the district court stated:

> With regard to the adjustment for role in the offense under 3B1.1(a), the Court agrees with the assessment of the probation officer; and, frankly, I don't have to get counsel from the probation officer on this point because I was the presiding judge in this trial, and I had plenty of opportunity to hear the evidence in this matter and listen to it very carefully.
> There is no doubt in my mind, based on the evidence before me, that the defendant was a source of methamphetamine for this conspiracy that involved five or more participants; he exercised control over large quantities of methamphetamine that were introduced into this community.
>
> . . .
>
> The evidence is not just proof beyond a reasonable doubt; it's proof beyond all doubt as far as this sentencing court is concerned that this individual was a leader of a substantial conspiracy. They may be motley but they were engaged in criminal conduct of the kind described in the indictment, and it would be a waste of time to

recount all of those in detail, but the record is very clear, [defense] counsel, as you well know since you were here.

Tr. of Sentencing Hr'g, R. Vol. 29 at 30-31. Later, at the time it imposed the sentence, the court further stated:

> My decision and the level at which I place you I think takes into consideration the severity of your crime, [and] your lack of remorse for its commission. It serves as an appropriate deterrent to others who might be similarly situated and might be inclined to leave their families to engage in criminal activity here in the District of Wyoming or in Colorado. . . .
>
> I think it's clear to say that you're not really deserving of any degree of compassion from this Court; and although the sentence is harsh, you're getting some anyway because, Mr. Arriola, I could have placed you in jail today for life. I have the power to do that. And, very candidly, sir, I think that sentence would stick and that your appeals of that sentence would be unavailing. But I'm not going to do that.

Id. at 50-51. First and most significant in our analysis is that these comments show the court considered the evidence supporting the drug quantity calculation and the leader/organizer enhancement to be overwhelming. After an independent review of the record, we agree. In the factual background section of this decision, we outlined the testimony of numerous witnesses and the physical evidence supporting the district court's conclusion that Arriola-Perez trafficked in at least fifteen kilograms of methamphetamine and that he was a ringleader.

Second, it is obvious from the district court's comments that even if we were to remand this case for resentencing, the court would not impose a different sentence. The court expressed its belief that the sentence was warranted. The

court also exercised its discretion when it sentenced Arriola-Perez to 400 months in prison, forty months above the bottom of the 360-months-to-life range. Cf. Labastida-Segura, 396 F.3d at 1143 (error was not harmless and remand was appropriate because sentence was imposed at bottom of range). The constitutional Booker error in this case was therefore harmless beyond a reasonable doubt.

## CONCLUSION

For the foregoing reasons, Arriola-Perez's conviction and sentence are AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge